## Hoover Estate

*W. Irvine Wiest,* for petitioner.

*W. H. R. Unger* and *Cummings & Gubin,* for respondent.

FORTNEY, P. J., April 30, 1947.—This matter comes before the court upon petition of Gertrude Reid, cestui que trust, under the last will and testament of her father, J. Frank Hoover, deceased, asking for the removal of Robert E. Malick, the testamentary trustee in said will. To this petition, respondent, Robert E. Malick, filed his answer denying the material allegations which petitioner alleges warrant his removal.

The proceedings were brought under the Fiduciaries Act of June 7, 1917, P. L. 447, sec. 53 (*a*), 20 PS §921.

This section empowers the orphans' court having jurisdiction to remove a fiduciary for reasons enumerated in nine different subsections. The general allegations in the petition, if they come within the provisions of the section of the act, must be grouped under one of the following subsections:

"1. When such fiduciary is wasting or mismanaging the estate or property under his charge, or is likely to prove insolvent, or has neglected or refused to exhibit true and perfect inventories, or render full and just accounts of such estate or property, come to his hands or knowledge;

"8. When, for any reason, the interests of the estate or property are likely to be jeopardized by the continuance of any such fiduciary;

"9. When all the cestuis que trust, or a majority of them, having the life estate under any trust, shall desire the removal of the trustee or trustees upon any substantial ground not hereinbefore enumerated, and the court, upon petition filed by them or any of them, shall be satisfied that such substantial ground for removal exists; in which case the court may remove said trustee or trustees, and appoint another or others as chosen by said parties;"

Stripped of all unessential facts, the present case discloses that J. Frank Hoover, a resident of Shamokin, Pa., died April 13, 1934, and by his last will and testament, duly probated, provided, inter alia, as follows:

"ITEM: I give, and bequeath unto my trustee hereinafter named, and to his successor or successors, all my shares of the capital stock of the News Publishing and Printing Company, a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania, with its registered office in the Borough of Shamokin, County of Northumberland and State of Pennsylvania, in trust nevertheless to pay over the net income thereof in quarterly or *other convenient payments* [italics supplied] unto my beloved wife

ELIZABETH R. HOOVER, for and during the full term of her natural life, and from and after her decease, to pay over the net income thereof in quarterly or other convenient payments unto my daughter, GERTRUDE, intermarried with GORDON REID, for and during the full term of her natural life and at the death of my said daughter, GERTRUDE REID, to assign the same to such person or persons and in such way and manner as my said daughter, GERTRUDE REID, may, by her last will and testament direct, limit, and appoint, or in default of such direction, limitation or appointment, to assign the same to and amongst the then living descendants of my said daughter, GERTRUDE REID, per stirpes, or, in default of such direction, limitation and appointment and in case there shall be no living descendants surviving my said daughter, GERTRUDE REID, said shares shall be distributed to my heirs under the present intestate laws of the Commonwealth of Pennsylvania."

In a subsequent provision in his will, testator provided the principal and income from this trust estate, so long as the trust continues, shall be free from the *control*, debts, liabilities and engagements of either of the beneficiaries, and shall not be subject to assignment, nor to execution or process for the enforcement of judgments against either of the said beneficiaries. Robert E. Malick, respondent in this case, was named both executor and trustee under this will. The widow, Elizabeth R. Hoover, died December 24, 1942, and petitioner, Gertrude Reid, then became, and is now, the active beneficiary under the trust. The trust res, at the time of the testator's death, consisted of 197⅔ shares of the capital stock of the News Publishing and Printing Company, hereinafter referred to, for convenience, as "the company". This company has, for years, published the local newspaper and has done job printing in this community. The shares in the trust fund were reduced, by agreement, to 196⅔, which

said shares remain today as the corpus of the trust estate. The total number of shares authorized to be issued by the company is 420, and at the death of testator all said shares were issued and outstanding. Testator, at the time of his death, was also president of the company.

The grounds on which the removal of the trustee is sought are grouped, for the purpose of this discussion, as follows:

1. Loss of confidence in the trustee arising from his conduct in the management of the trust estate.

2. Hostile and adverse interest of the trustee.

3. Use by the trustee of his office for his personal benefit.

1. The record discloses that the trustee did not set up the trust estate until May 5, 1942, a period of more than eight years after the death of testator, but permitted the shares of stock, the subject of the trust, to remain in the name of J. Frank Hoover. Respondent, likewise, did not open a bank account as trustee until August 31, 1946. This is but a technical violation of his duty as trustee and in our judgment, in itself, is not sufficient ground for removal: Mathues's Estate, 322 Pa. 358. The record discloses, too, that the income from this trust estate was paid at the rate of $45 per week, by checks drawn on the treasury of the company, to both Mrs. Hoover, the former beneficiary, and Mrs. Reid, the present beneficiary. This procedure was followed for a period of about 11 years. To this manner of paying the income, there can be no complaint, for the reason that this plan was followed at the request of both beneficiaries, and for the additional reason that the will of testator provides that the income from the trust investment shall be paid in quarterly *or other convenient payments.*

Petitioner alleges that the trustee conspired with the remaining directors of the board in an effort to

defraud her in the issue of certain shares of stock which had been bought by the company and placed in its treasury. The gist of the offense of conspiracy is an unlawful confederation, and a conspiracy is defined as: "where two or more persons, falsely and maliciously, agree to cheat and defraud any person of goods, chattels or other property, or to do any other dishonest, malicious or unlawful act to the prejudice of another". A reading of the testimony refutes, in its entirety, this allegation. The members of the board of directors are responsible and respected citizens of the community and such a grave offense ought not to be charged against a fiduciary or the directors, unless, before giving currency to the imputations, they are certain of their ground.

It was sought to show, by the testimony, that respondent entered into contracts for purchases, and contracts with the union, personally, without consultation with the members of the board of directors. It is true that the record shows that these matters were not taken up at a regular board meeting and passed by a resolution. The testimony also shows, in many of these cases, the contracts were renewed automatically, from year to year, and in all cases, the questions of renewing contracts were discussed with members of the board and agreed upon by them.

Another alleged example of mismanagement of the trust estate is the transferring to surplus of more of the net profits from the operation of the company than is prudently necessary. It is true substantial depreciation and reserves for replacements and repairs, as well as reserve for expansion of the business, have been set up annually. The company showed a net profit each year, varying from $22,019.03, in 1934, to $32,512.22, in 1945, and in addition, dividends have been paid during these years, varying from $5,880, in 1934, to $10,500, in 1945. The record also shows that prior to the death of testator, and before the

election of respondent as president of the company, dividends were paid once or twice, in the amount of $5 per share. This conduct of the trustee, in the management of the company, in our opinion, does not exceed the dictates of reasonably sound judgment and discretion. What was said in Hodgson's Estate, 342 Pa. 250, 260, is applicable here. It was there said: "While of course they reduce the income of the trust, to the dissatisfaction of petitioners, we do not believe they are seriously objectionable in amount, as is urged upon us, or out of line with a properly conservative management of the business". It cannot be denied that this company is in a considerably improved financial condition now than when respondent assumed the active management, and it is not reasonable to suppose that testator intended that the financial condition of the company should be depleted of a safe margin of surplus by turning it all over to the life beneficiaries upon its accrual. This course of conduct would not, in our judgment, sufficiently protect the ultimate beneficiaries of this trust fund. As was said in Price's Estate, 209 Pa. 210, p. 211:

"Mere differences of opinion or judgment between the trustee and the cestui que trust are not enough to justify the removal of the former."

2. Petitioner, under date of July 30, 1946, wrote respondent a letter, in which she outlined a number of questions concerning the trust estate which she desired to have answered for her own information. Most of these questions were pertinent to the management of the trust estate. To this letter respondent replied, answering some, but not all, the questions asked by petitioner. One of the important questions not answered was what happened to the stock of the Scott estate which was purchased by the company and placed in its treasury. Then followed a series of exchanges of correspondence between petitioner and an attorney employed by petitioner, and trustee. Peti-

tioner alleges that the financial statement of the company sent to her does not disclose a loan made to the trustee individually, and in addition, that she was never advised that the Scott stock, purchased by the company and placed in its treasury, was ever sold, but on the contrary, was told by the trustee himself, as late as 1945, that this stock still remained in the treasury. It later developed this stock was sold in the year 1944. It is not our purpose or intention to catalogue all the various complaints of petitioner in relation to her failure to have access to the books and records of the company, and the failure of the trustee to give her information concerning the trust estate, which she claims she was entitled to have. To do so would unnecessarily lengthen this opinion for no good purpose. It is one of the duties of a trustee to keep the cestui que trust fully informed of his actions: Wheeler's Assigned Estate, 287 Pa. 416, 419. It is difficult to understand why the trustee should refuse to give petitioner the information requested, when it is too well established to require citation of authority that such information could be obtained by her, as in fact it was, in the testimony of this proceeding. Petitioner claims these actions of the trustee engendered an irreconcilable hostility between them and provoked active antagonism. It was said in Mathues's Estate, 322 Pa. 358, and is applicable here, that active antagonism of the beneficiaries of an estate, or their representatives, toward the trustee, is not sufficient to require the removal of the trustee, unless provoked by the latter and likely to jeopardize the estate.

3. The complaint that the trustee used his office for his personal benefit presents a most serious question for consideration. The specific contention here is that the trustee used the voting capacity of the trust shares to enhance his own interest at the expense of the trust. This is an attempt to invoke the rule that a trustee

shall not make profit for himself by use of the trust. To sustain this allegation, testimony was offered that immediately after the death of testator, to wit, on April 20, 1934, the trustee had himself elected president of the company at a salary of $85 per week. This rate of salary continued until February 21, 1938, and between the latter date and June 17, 1940, by successive raises in salary, by authority of the board of directors, the trustee, as president of the company, was being paid at the rate of $300 per week. Since June 17, 1940, until late in the year 1946, the trustee received salary at the rate of $300 per week. The testimony also shows salary paid the former president was at the rate of $5,000 per year. It is to be noted, too, from the record, that the trustee voluntarily reduced his salary from $300 per week to $250 per week from March 26, 1941, to February 8, 1942, and that he also drew from the company the sum of $50 per month expenses for a period of about four years. In addition to the regular salary, the trustee received as president of the company, upon authority of the board of directors, additional salary, termed in the minutes: "President's Salaries". These salaries were generally paid at the end of the year for services rendered during the past year, beginning with the year 1937 and extending through the year 1945, and were in amounts varying from $200 to $500 per year, or a total of about $2,800. In addition, he received, in the same manner, in the year 1941, 2 shares of the stock of the company which had been placed in the treasury. He also received, by resolution of the board of directors, in the year 1936, the sum of $750; in the year 1944, the sum of $25; in the year 1945, the sum of $1,000, listed as "bonus". Petitioner contends that the duties of respondent as president of the company have not increased in proportion to the increases in salaries. A careful reading of the record discloses that not only the actual work performed by the respondent as presi-

dent increased, compelling him to work longer hours, but also, the responsibility of the duties as president of the company compelled him to devote much additional time to his work. The acts complained of here are not committed as trustee but as president of the company and the evils, if any, to the trust are only a reflex of the injuries to the company. To consider these evils, we must enter into an inquiry affecting a corporate body, which is not before us, and which cannot be affected by any decree we might make. We are asked to sit in judgment upon the internal management of a company, not at the instance of shareholders, but upon petition of a cestui que trust. If, as is contended by petitioner, the trustee, by virtue of his ability to vote the trust shares of stock held in this company, together with those he owned in his own right (the trustee increased his personal holdings in this company from 2 shares at the time of the death of testator to 131-1/12 shares (at the date of this hearing), elected a board of directors of his own selection, and should they endeavor to improperly manage the affairs of this company, the remedy to correct this condition is not in the orphans' court upon petition of cestui que trust: Lafferty's Estate, 198 Pa. 433 at 435.

Of equal importance are the actions and conduct of this trustee upon his visit to Emporium in June of 1940. The testimony shows that there were 60 shares of stock of this company for sale, which were owned by the Clayton Scott estate. At this meeting, the trustee discussed with testator's widow, Mrs. Hoover, who was the then life beneficiary under the trust, with Mrs. Reid, the present life beneficiary, and her husband, the purchase of this stock. It was the desire of the life beneficiary to buy additional stock, which, when added to the trust shares, would eventually give the family control of the company. It appeared that the life beneficiary did not have sufficient money to

purchase the stock, whereupon this trustee proposed a plan to her, which was as follows: That the company would purchase the said stock and put it in the treasury as treasury stock. This would reduce the authorized outstanding issue in such an amount as to give the trust estate the control. It was agreed upon, at the time, between the parties, that the trustee should have the right to purchase in his own name 10 shares of the stock, leaving 50 shares to be purchased by the company and placed in its treasury. The trustee caused the company to purchase 55 shares of this stock and had it placed in the treasury of the company. It subsequently developed that by resolution of the board of directors of the company, at a special meeting held on August 29, 1944, without any notification to the then life beneficiary, this respondent purchased the same 50 shares of stock from the company, taking title thereto in his own name. Petitioner further testifies that it was not until the year 1946 that she was apprised of the fact that the stock had been taken from the treasury and sold, but on the contrary, was led to believe, by the trustee himself, that it remained in the treasury as late as the year 1945. Petitioner also testifies that she knew this stock was for sale for several years before it was purchased by the company and consulted her attorney concerning the purchase of 15 shares. Respondent contends that he made no promise to petitioner that the stock would always remain in the treasury, neither was he under any legal obligation to purchase this stock for the life beneficiary. This is correct as a proposition of law, but we feel that having purchased the stock and placed it in the treasury under the plan proposed by the trustee himself, it was most certainly the duty of this trustee to advise the life beneficiary under the trust of his intention to buy the stock from the company and at least give her an opportunity to enter into competitive bidding with him for its purchase, and most certainly it was a

breach of confidence of the trust relationship to represent to the life beneficiary, for a period of almost two years, that the stock still remained in the treasury, when, in fact, he personally owned it himself. In addition, we note that when the trustee personally purchased this stock from the company, he agreed to pay the company at the rate of $250 per share, or a total of $12,500. In payment thereof, he gave to the company his note, with sufficient collateral, in the amount of $12,500, upon which he paid interest at the rate of two percent per year. At this time, the company was paying dividends at the rate of $25 per share per year. By the process of mathematical calculation, it can easily be determined that the trustee, in this transaction, made $1,000 net profit per year for himself. This seems to us to be a use of his office as trustee for his personal benefit.

Even more serious are the actions and conduct of the trustee in his attempts to terminate this trust. Beginning with the meeting at Emporium in June of 1940, and continuing at a meeting in the fall of 1944, in the month of November, discussion was had between the trustee and the life beneficiary concerning his purchase of the stock in the trust estate. The assets of the company were discussed, as was its general financial condition, for the purpose of arriving at the value of the stock held in trust. The next meeting between the trustee and petitioner was in the spring of 1945. The trustee again went to the home of petitioner. At this time, petitioner advised the trustee that if she could use the money herself as she saw fit, she would sell the stock in the trust estate. The negotiations developed to the place where the trustee made a definite offer of $80,000, which was refused. The trustee then increased the offer to $100,000, exclusive of income tax. Petitioner's husband testifies: "Mr. Malick always brought this matter up." (Meaning the purchase of the trust shares.) It is to be remembered

that testator had implicit faith and confidence in this trustee and a reading of his will indicates that his fundamental purpose in the creation of the trust was to protect his beneficiaries from anticipated danger, from creditors, from risks of business and probably from their own improvidence, and in addition, to protect the ultimate beneficiaries from *waste or spoliation of the estate by the immediate ones*. With this thought in mind, we cannot reconcile the trustee's letter to the beneficiary, in which he says, as follows: "You will recall that it was only after you told me that you had decided that your son might not be interested in the newspaper business, and *that your husband might need business capital* (Italics supplied), that I gave any consideration to the idea of making an offer for this stock." For a trustee who is duty bound to protect not only the life beneficiaries but the ultimate beneficiaries under the trust, the thought of terminating the trust with the full knowledge that the life beneficiary wanted absolute control of the money derived therefrom, and that the husband of the life beneficiary might need business capital, warrants the inference that the trustee either had no proper conception of his duty under his fiduciary relationship to this trust estate, or he defiantly breached that duty. It is undoubtedly the law that the loyalty which a trustee owed to his beneficiaries is the basic factor of trust relationship, and once a trust is accepted, it must be administered solely in the interest of the beneficiaries: Commonwealth Trust Co. Case, 331 Pa. 569 at 575. The attempt of the trustee to personally buy the trust shares from the life beneficiary, even though he could not legally do so, and his plan to resign as trustee and substitute the husband of the life beneficiary as the trustee are in direct contravention to the duties imposed upon him. Testator was well aware, when he wrote his will, that his daughter was married, and if he had intended her husband to be trustee he could

easily have appointed him. The very fact that he put a spendthrift trust provision in the will, and specifically provided that both principal and income shall be free from the control of either of the named beneficiaries, is some evidence that he did not want either his wife or his daughter, and presumably her husband, to manage the trust res. It matters not that the attempts to terminate the trust were not accomplished and no injury befell the trust estate. The law is not intended to be only remedial of actual wrong, but preventative of the possibility of it. A fiduciary may be removed if for any reason the interest of the estate or property is *likely* to be jeopardized by the continuance of such fiduciary: Hughes's Estate (No. 1), 319 Pa. 321 at 324.

The conduct of the life beneficiary, petitioner in this case, is not to be approved, but rather, condemned. In response to a question of whether or not she was trying to find ways and means, in her negotiations with the trustee, to terminate this trust, whereby she could get control of the money in the trust estate, she answers in the affirmative, and says this was her thought. Petitioner testifies she thought over the matter of the sale of the shares of stock and concluded it would be good if she could invest the money . . . then it would not be under the trust any more. She further testifies that even though she had been advised she could not terminate the trust legally, she was still willing to sell at a good price. The picture, as it is now developed, presents on one hand, a trustee attempting to buy from the life beneficiary the trust estate, and on the other hand, a life beneficiary, not only willing but eager, to dispose of the trust estate—her sole condition precedent being that she must have the money to invest as she pleased. Neither the life beneficiary nor the trustee, in our judgment, show any concern for the interest of the ultimate beneficiaries, to say nothing of the expressed wish in the will of testator that he wanted

neither life beneficiary to have unrestrained control over the trust estate.

It is urged upon us, by counsel for the trustee, that even though there were technical breaches of this trust, it did not occasion financial loss, and while the trustee was responsible for these breaches, they were brought about, perhaps ignorantly. It will not suffice to attempt to explain the errors admitted by respondent by saying they were attributable to ignorance. He is a man whose life has been spent in newspaper work, which requires more than ordinary intelligence and acuteness of understanding. A letter written by the trustee to petitioner also negatives the defense of ignorance. This letter says: "You should realize that I have had legal advice and counsel from the inception of my trusteeship 12 years ago."

When we consider the actions of the trustee in this case, in the light of the familiar principle of law, that the removal of a trustee is a drastic action and one which should only be taken when the estate is actually endangered and intervention is necessary to save the trust property (Crawford's Estate, 340 Pa. 187. Hartman's Estate, 331 Pa. 422, 428), we might conclude that any single act of the trustee amounting to a breach of his trust, or proof of an isolated instance of a breach of the trust may not be sufficient to warrant his removal: Bailey's Estate, 306 Pa. 334. Our duty does not permit us to consider alone isolated instances or technical breaches of the trust, but rather, an overall view of the entire picture. This consideration of the case presents to us, from undenied testimony, a trustee who failed to set up the trust fund; neglected to open an account as trustee; proposed to the life beneficiary that he would buy and place in the treasury of the company certain shares of stock of the company for the benefit of the ultimate beneficiaries (which he did actually buy and place in the treasury) and which he subsequently purchased from the company in his own

name, without notice to the life beneficiary; the borrowing from the company the purchase price for this stock, by which transaction he earned for himself a net profit of $1,000 per year in dividends; at least two separate attempts to terminate the trust and buy the stock of the trust estate from the life beneficiary, as well as an offer to resign as trustee and have the husband of the then life beneficiary appointed in his place. Under this statement of facts, we are unable to see how it can be reasonably contended that the trust estate was not put in jeopardy, jeopardy being defined as: "exposed to loss, injury or peril; or putting in danger."

If the confidence reposed in the trustee by the creator of the trust has been abused and the interest of the beneficiaries is liable to suffer thereby, the court should act promptly and effectively in affording adequate relief: Neafie's Estate, 199 Pa. 307. When a court is called upon to remove a trustee, the question in each case is whether the circumstances are such that the continuance of the trustee in office would be detrimental to the trust. In this case, respondent has shown unusual ability and exceptional qualities in the management of this company. The financial progress of the company, due to his managerial skill, has undoubtedly increased the value of the trust shares. Even though these facts weigh heavily in the scales against the wrong conduct proved against him as trustee, neither such ability nor such qualities excuse his conduct as trustee. We therefore make the following:

## Order

And now, to wit, April 30, 1947, after due consideration, the prayer of the petition is granted. Respondent, Robert E. Malick, is removed as trustee under the last will and testament of J. Frank Hoover, late of the Borough of Shamokin, deceased. Costs to be paid by petitioner.